UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARGARET E. DARGAN, a single person
and resident of the state of Oregon,

          Plaintiff,

      v.

GARY V. INGRAM, a Washington resident,
individually; PAMELA M. NODUS, a
Washington resident, individually; and the
marital community of GARY V. INGRAM
and PAMELA M. NODUS,

          Defendants.

NO. C08-1714RSL

ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

## I.  INTRODUCTION

This matter comes before the Court on "Plaintiff's Motion for Preliminary Injunction,"
Dkt. #13.  Plaintiff seeks restitution from defendant Gary Ingram in accordance with an
outstanding Restitution Order.  She also contends that Mr. Ingram has made fraudulent transfers
of cash and assets to his wife, Pamela Nodus, in order to hide those assets from plaintiff.
Plaintiff requests a preliminary injunction to ensure that defendants do not hide or diminish their
assets and thereby deny her access to the restitution she seeks upon completion of the case.  The
Court heard oral argument on May 21, 2009.  For the reasons set forth below, the Court grants in
part plaintiff's motion.

ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 1

## II.  DISCUSSION

### A.  Background

On January 5, 1994, Mr. Ingram was convicted of several counts relating to his embezzlement of funds from plaintiff.  Dkt. #15, Ex. 1, 14.  Mr. Ingram admitted that, after plaintiff gave him a limited power of attorney based on his assistance in managing contracts and securities plaintiff inherited from her husband, he liquidated her assets and diverted the proceeds for his own use.  Dkt. #15, Ex. 14, ¶¶ 8-9.  The total amount embezzled from plaintiff was $1,052,228.  Id. ¶ 9.  As part of the criminal judgment, Mr. Ingram agreed to pay restitution to plaintiff in that amount.  Dkt. #15, Ex. 1.  The Restitution Order required Mr. Ingram to, among other things, make monthly payments of $4,400 to plaintiff until full restitution has been made and to notify plaintiff of any acquisition of property valued in excess of $10,000.  Id.  Mr. Ingram was incarcerated in federal prison from approximately February 1994 to December 1996.

On February 23, 1994, Mr. Ingram stipulated to the entry of a civil monetary judgement in the amount of $1,158,000.  Dkt. #14, Ex. 1.  This civil judgment was extended for another ten years in January 2004.  Dkt. #14, Ex. 2.  Plaintiff calculates that the principal and interest owed by Mr. Ingram as of March 1, 2009 was approximately $3,756,822.26.  Declaration of Beth M. Andrus ("Andrus Decl."), Dkt. #15 ¶ 9, Ex. 4.

After his release from prison, Mr. Ingram resided and worked in Seattle, Washington as an employee of a landscaping company.  Deposition of Gary V. Ingram ("Ingram Dep."), Dkt. #15, Ex. 2 at 84.  In November 1998, he began to live with his then girlfriend and current spouse, Ms. Nodus, in Poulsbo, Washington.  Id. at 83.  The relationship between Mr. Ingram and Ms. Nodus was an exclusive romantic relationship and they have continuously lived together since that time.  See Deposition of Pamela Nodus ("Nodus Dep."), Dkt. #15, Ex. 12 at 105-06.

Between November 1998 and February 2008, Mr. Ingram gave Ms. Nodus money for rent

ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 2

1    and reimbursement of living expenses, id. at 17-18, however Ms. Nodus has not regularly kept

2    records of these payments, id. at 21, 26.  Ms. Nodus usually deposited these funds into a bank

3    account on which Mr. Ingram was listed as a signatory.  Id. at 101-02.  In 2004, she deposited

4    the proceeds from the sale of her Poulsbo home into that same account, id. at 46, and in

5    February 2000, Ms. Nodus purchased land on Whidbey Island using funds from that account, id.

6    at 29-30, 52.  The land, however, was titled only in Ms. Nodus's name.  Dkt. #15, Ex. 5.

7         Ms. Nodus completed construction of a residence on the Whidbey Island property in

8    approximately 2005 or 2006.  Mr. Ingram provided labor – including framing, carpentry,

9    electrical work and plumbing – during the original construction of the home, Ingram Dep. at

10   100-04, 132-34, and he used some of his own earnings to fund the construction of improvements

11   to the home, id. at 146-47.  Mr. Ingram also invested money to develop a garden and orchard on

12   the Whidbey Island property.  Id. at 107-08.  Mr. Ingram used the Whidbey Island property and

13   home to conduct a business known as Holistic Gardens, although he did not compensate Ms.

14   Nodus for the use of the property titled in her name.  Id. at 49-50.

15        In March 2006, Mr. Ingram obtained a real estate license from the State of Washington

16   and has sold residential and commercial real estate since that time.  Between March 2006 and

17   April 2008, he operated as a sole proprietorship, using business equipment purchased by Ms.

18   Nodus, a vehicle owned by Ms. Nodus, and the Whidbey Island home as his office.  Id. at 32-33.

19   Mr. Ingram reimburses Ms. Nodus for her payment of his business expenses and for mileage on

20   her car, id. at 32, but Ms. Nodus keeps no contemporaneous record of his payments, Nodus Dep.

21   at 14.[1]  In 2006, Mr. Ingram filed tax returns reporting commissions of $62,900, Dkt. #15, Ex.

22   17, and in 2007 he reported commissions of $94,000, Dkt. #15, Ex. 18.  He did not notify

23   plaintiff of his receipt of any real estate sales commissions.  During the period in which Mr.

24

25        [1] On the night before oral argument, Mr. Ingram submitted a schedule of payments made to Ms.

26   Nodus since March 2006.  Dkt. #46, Ex. N.  This document was created in preparation for litigation.

27   ORDER GRANTING IN PART
     PLAINTIFF'S MOTION FOR
28   PRELIMINARY INJUNCTION - 3

Ingram operated as a sole proprietor selling real estate, he placed $20,000 from commissions into a 401(k) account, see Dkt. #15, Ex. 23, but did not inform plaintiff of this transaction, Ingram Dep. at 38.

On two occasions, Mr. Ingram's brother Virgil gave large cash gifts to Ms. Nodus totaling approximately $70,000. Ms. Nodus deposited the money into the bank accounts on which Mr. Ingram was listed as a signatory and used the money to pay off liabilities associated with the Whidbey Island home and to pay off a Toyota truck loan. Nodus Dep. at 68-72.

Mr. Ingram and Ms. Nodus got married in December 2006 after executing a prenuptial agreement in which they designated all real and personal property listed in the schedules to the agreement as "separate property," and transferred to the other any interest or right they might have in such property. Dkt. #15, Ex. 16. Schedule I identified the Whidbey Island property, a Toyota truck, all household furnishings and computer equipment, and cash in the Whidbey Island Bank account and School Employees Credit Union (SECU) bank account as Ms. Nodus's separate property. Id. at 18. Schedule II identified $15,987 in a Whidbey Island Bank account and $16,300 in a Fidelity IRA as Mr. Ingram's separate property. Id at 19.

In April 2008, Mr. Ingram and a business partner incorporated Whidbey Island Real Estate Services, Inc., dba IngramParker.com. Ingram Dep. at 10-11. Mr. Ingram and Ms. Nodus each owned 25% of the corporation. Id. at 12. Ms. Nodus was initially named as the registered agent of the corporation and remains listed as the corporate secretary in state records. Dkt. #15, Ex. 8.

In that same month, plaintiff's counsel contacted Mr. Ingram and requested that he begin making restitution payments more in line with the income he was generating from his real estate sales business. Andrus Decl., Dkt. #15, ¶ 13. Mr. Ingram responded that he has no assets with which to pay more than a nominal amount in restitution. Id. Shortly thereafter, on the advice of Ms. Nodus's attorney, defendants closed their joint bank account containing $16,000 and split

ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 4

1  the cash 50/50.  Nodus Dep. at 100.  Mr. Ingram neither disclosed the existence of this cash to

2  plaintiff nor paid her any amounts from it.

3      Plaintiff filed suit on November 26, 2008.  Dkt. #1.  On January 6, 2009, defendants

4  applied for and received a home equity line of credit from SECU in the amount of $100,000,

5  using the Whidbey Island home as collateral.  Andrus Decl., Dkt. #15 ¶ 14, Ex. 11.  Plaintiff

6  contends that by drawing loan funds against this real estate, defendants are diminishing their

7  equity in the real estate that may be subject to plaintiff's judgment.  Plaintiff subsequently filed

8  the present motion seeking to freeze defendants' assets.

9  **B. Analysis**

10     **1. Preliminary Injunction Standard**

11     The Court may issue a preliminary injunction pursuant to Fed. R. Civ. P. 65(a).  "A

12 plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the

13 merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

14 balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v.

15 Natural Res. Def. Council, Inc., 129 S.Ct. 365, 374 (2008).[2]

16     The Court has inherent equitable power to issue provisional remedies, such as a freeze

17 asset order, which are ancillary to its authority to provide final equitable relief.  Reebok Int'l,

18 Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559 (9th Cir. 1992).  There is no question that

19 plaintiff has asserted a cognizable equitable claim.  Plaintiff seeks, among other things,

20 permanent injunctive relief invalidating defendants' prenuptial agreement and prohibiting the

21 fraudulent transfer of assets from Mr. Ingram to Ms. Nodus.  See Compl., Dkt. #1 at 15-17.

22 Defendants do not dispute the Court's authority to issue a freeze asset order at this stage of the

23

─────────────

24     [2] Although plaintiff cites the Ninth Circuit standard articulated in Save our Sonoran, Inc. v.
   Flowers, 408 F.3d 1113 (9th Cir. 2005), which requires only "the possibility of irreparable injury to
25 plaintiff if preliminary relief is not granted," id. at 1120, the Supreme Court recently held that "the Ninth
   Circuit's 'possibility' standard is too lenient," Winter, 129 S.Ct. at 375.
26

27 ORDER GRANTING IN PART
   PLAINTIFF'S MOTION FOR
28 PRELIMINARY INJUNCTION - 5

case.

Ms. Nodus contends that a preliminary injunction is not appropriate where the harm to plaintiff constitutes solely economic loss. Dkt. #21 at 5. But while it is true that preliminary relief is unnecessary when the plaintiff's economic injury can be remedied by a damage award, see Rent-A-Center v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991), plaintiff's present motion asserts that without a preliminary injunction, defendants may diminish their assets thereby rendering ineffective any subsequent judgment in her favor. "A Court has the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies." Reebok Int'l, 970 F.2d at 559 (quoting Republic of the Philippines v. Marcos, 862 F.2d 1355, 1364 (9th Cir. 1988); see also In re Estate of Ferdinand Marcos, Human Rights Litigation, 25 F.3d 1467, 1480 (9th Cir. 1994) ("[A] district court has authority to issue a preliminary injunction where the plaintiffs can establish that money damages will be an inadequate remedy due to impending insolvency of the defendant or that defendant has engaged in a pattern of secreting or dissipating assets to avoid judgment."). To obtain preliminary relief, therefore, plaintiff must establish "not only that [she] is likely to become entitled to the encumbered funds upon final judgment, but also that without the preliminary injunction, the plaintiff will probably be unable to recover those funds." Chicago Title Ins. Co. v. Lexington & Concord Search and Abstract, LLC, 513 F.Supp.2d 304, 319 (E.D. Pa. 2007) (citing Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 197 (3d Cir. 1990)).

### 2. Likelihood of Success on the Merits

Plaintiff asserts two substantive causes of action. The first seeks restitution from Mr. Ingram under federal law, and the second seeks to reach Ms. Nodus's assets in satisfying Mr. Ingram's debt pursuant to state law.

Plaintiff has certainly demonstrated a substantial likelihood of success on the merits of

ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 6

1  her federal claim.  Plaintiff is a crime victim as defined by 18 U.S.C. § 3771(e) because she was

2  directly and proximately harmed as a result of defendant's commission of a federal offense.  See

3  Dkt. #15, Ex. 1 at 1, 6.  As such, she is entitled to "full and timely restitution as provided in

4  law," 18 U.S.C. § 3771(a)(6), and may enforce that right through an action in this Court, id. §

5  3771(d)(1).  Mr. Ingram has violated the terms of the Restitution Order in several ways.  He has

6  failed to make monthly payments in the amount of $4,400.[3]  He also testified that he has failed

7  to abide by the requirement that he notify plaintiff if he acquires any assets in excess of $10,000,

8  Ingram Dep. at 241-42, and that he contributed $20,000 to his 401(k) without plaintiff's written

9  consent, id. at 38; see Dkt. #15, Ex. 1, "Terms of Restitution" at 3.  Furthermore, Mr. Ingram

10  has failed to establish a life insurance trust naming plaintiff as a beneficiary, Dkt. #15, Ex. 1,

11  "Terms of Restitution" at 2-3; Ingram Dep. at 117-18.

12  In his response to plaintiff's motion, Dkt. #18, Mr. Ingram does not dispute this evidence.

13  Instead, he asserts only that "[i]t is not reasonable creditor behavior" for plaintiff to pursue

14  collection of the debt she is owed given that Mr. Ingram does not now and never has had the

15  funds required to satisfy his legal obligation.  Id. at 2.  Mr. Ingram provides an extensive

16  analysis of the IRS's policy regarding basic living expenses and contends that his net income can

17  barely cover that amount.  However, at no point does he address plaintiff's allegation (and

18  indeed his own sworn testimony) that he deposited $20,000 in his 401(k) in 2003.  This evidence

19  indicates that not only did Mr. Ingram have a substantial cash asset at one time, but also that this

20  money was not needed to cover his basic living expenses.  Although Mr. Ingram's counsel four

21  times contends that "[t]he numbers speak for themselves," id. at 2, 4, 6, 7, Mr. Ingram does not

22  dispute the damning evidence that at one point he had ample funds available yet neglected to

23  abide by his legal obligation to plaintiff.

24

25      [3] In his response brief, Mr. Ingram asserts that he regularly pays $200/month in restitution to

26  plaintiff.  Dkt. #18 at 4.

27  ORDER GRANTING IN PART
   PLAINTIFF'S MOTION FOR
28  PRELIMINARY INJUNCTION - 7

1    At the most, Mr. Ingram has shown only that he is unable to pay off his debt in its

2  entirety.  He has not refuted either that he has violated the Restitution Order or that he can pay

3  plaintiff some amounts toward satisfying his debt.  In fact, his brief concedes that he is capable

4  of paying at least twice the monthly amount he currently pays plaintiff.  Dkt. #18 at 4.

5  Therefore, the evidence indicates plaintiff is likely to succeed on the merits of her federal claim

6  against Mr. Ingram.

7    Plaintiff has also demonstrated that she is likely to prevail on her state law claim against

8  Mr. Ingram and Ms. Nodus.  Pursuant to the Uniform Fraudulent Transfer Act ("UFTA"), "[a]

9  transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor

10  made the transfer or incurred the obligation: (1) With actual intent to hinder, delay, or defraud

11  any creditor of the debtor; or (2) Without receiving a reasonably equivalent value in exchange

12  for the transfer or obligation[.]"  RCW § 19.40.041(a).  In determining actual intent, the Court

13  may consider whether:

14    (1)    The transfer or obligation was to an insider;

15    (2)    The debtor retained possession or control of the property transferred after

16  the transfer;

17    (3)    The transfer or obligation was disclosed or concealed;

18    (4)    Before the transfer was made or obligation was incurred, the debtor had

19  been sued or threatened with suit;

20    (5)    The transfer was of substantially all of the debtor's assets;

21    (6)    The debtor absconded;

22    (7)    The debtor removed or concealed assets;

23    (8)    The value of the consideration received by the debtor was reasonably

24  equivalent to the value of the asset transferred or the amount of the obligation

25  incurred;

26

27  ORDER GRANTING IN PART
   PLAINTIFF'S MOTION FOR
28  PRELIMINARY INJUNCTION - 8

1    (9)    The debtor was insolvent or became insolvent shortly after the transfer was

2    made or the obligation was incurred;

3    (10)    The transfer occurred shortly before or shortly after a substantial debt was

4    incurred; and

5    (11)    The debtor transferred the essential assets of the business to a lienor who

6    transferred the assets to an insider of the debtor.

7    Id. § 19.40.041(b).  "Under the UFTA, proof of actual intent must be demonstrated by clear and

8    satisfactory evidence, but all 11 badges of fraud enumerated above need not be present in order

9    to establish this intent."  Douglas v. Hill, 148 Wn.App. 760, 199 P.3d 493, 497 (2009).

10    Plaintiff has presented evidence of "multiple badges of fraud", id., associated with the

11    financial transactions between the two defendants.  First, as Mr. Ingram's co-habitant and

12    spouse, Ms. Nodus is an "insider" under the statute.  See RCW § 19.40.011(7)(i)(A); United

13    States v. Townley, 2004 U.S. Dist. LEXIS 29722 at *27 (E.D. Wash. 2004).  Second, Mr.

14    Ingram resides in the Whidbey Island home and maintains an orchard and garden on the

15    property.  Ingram Dep. at 89, 107-08.  He also drives Ms. Nodus's car between five and seven

16    days a week for his real estate business.  Id. at 54.  Although the home, property, and vehicle are

17    all titled in Ms. Nodus's name, and despite the prenuptial agreement relinquishing any interest

18    Mr. Ingram may have had to that property,[4] Mr. Ingram's testimony reveals that he maintains

19    possession or control of those assets.

20    Third, plaintiff has provided compelling circumstantial evidence that Mr. Ingram has

21    concealed his transfer of funds to Ms. Nodus.  For instance, at no point did Mr. Ingram reveal

22    that he spent over $20,000 for a fence to be installed on the Whidbey Island property.  Decl. of

23    Lindsey Pflugrath ("Pflugrath Decl."), Dkt. #31 ¶ 9, Ex. H.  Moreover, the circumstances

24

25    [4] Property acquired during a meretricious relationship is presumed to belong to both parties.  In

26    re Marriage of Pennington, 142 Wn.2d 592, 602 (2000).

27    ORDER GRANTING IN PART
     PLAINTIFF'S MOTION FOR
28    PRELIMINARY INJUNCTION - 9

surrounding the substantial sums Ms. Nodus received from Mr. Ingram's brother Virgil as part of his parents' inheritance strongly suggest that Virgil intended his brother to receive the benefit of the family inheritance without having to report the money to plaintiff.  Ms. Nodus contends that the money she received from Virgil was a gift.  Dkt. #21 at 8.  Although Ms. Nodus is correct that a gift of personal property is valid as between the donor and donee upon a showing of donative intent, delivery, and donee control, see id. (citing In re Estate of Oney, 31 Wn.App. 325, 329 (1982)), the Court applies greater scrutiny where the interests of third party creditors are involved, see Sinclair v. Fleischman, 54 Wn.App. 204, 208-09 (1989) (analyzing whether creditors are prejudiced in determining validity of gift); cf. Eggleston v. Sheldon, 85 Wn. 422, 428 (1915).  Although Virgil testified that he and his wife gave the money to Ms. Nodus as a gift, Dep. of Virgil Ingram ("Virgil Dep."), Dkt. #15, Ex. 20 at 28, the precise dollar and cent amount of the gift was similar to inheritance amounts he distributed to his other brothers, id. at 27-28, indicating the "gift" was meant as Mr. Ingram's share of his family's estate.[5]  Moreover, Ms. Nodus deposited the gift into an account on which Mr. Ingram was listed as a signatory, Nodus Dep. at 68-72.  Mr. Ingram, then, had ready access to the gift from his brother to Ms. Nodus.  Virgil imposed no restrictions on Ms. Nodus's use of the money, Virgil Dep. at 37-38, and Ms. Nodus put the money towards the construction loan on the house in which she and Mr. Ingram reside and which Mr. Ingram uses as a business office, Nodus Dep. at 81.  Despite his access to the money and the benefits he derived from the money, Mr. Ingram did not report the inheritance to plaintiff.

Fourth, not only had Mr. Ingram been sued before the transfers were made, see Dkt. #14, Ex. 1, 2, but also all parties involved in the allegedly fraudulent transactions knew of Mr. Ingram's outstanding debt to plaintiff.  Ms. Nodus was well aware of Mr. Ingram's debts; in

---

[5]  Virgil's wife Cheri Ingram submitted a declaration stating that they "decided to give Pam the same amount as a share from the will, minus the amount we were told we'd have to pay in gift taxes for giving Pam such a gift in one year."  Dkt. #44 ¶13.

ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 10

1    fact, her desire to disclaim responsibility for those debts motivated her to obtain the prenuptial

2    agreement.  Decl. of Pamela Nodus, Dkt. #22 ¶ 15.  Virgil also testified that he knew his brother

3    owed money when he decided to give nearly $70,000 to Ms. Nodus.  Virgil Dep. at 35.

4         Plaintiff further contends that the prenuptial agreement is invalid because Mr. Ingram

5    received no consideration in exchange for the transfer of his interest in any community property

6    to Ms. Nodus.  Ms. Nodus responds that "[m]arriage is not only adequate, but is consideration of

7    the highest value."  Dkt. #21 at 7 (quoting Friedlander v. Friedlander, 80 Wn.2d 293, 300

8    (1972).  But regardless of the validity of the prenuptial agreement itself, the evidence indicates

9    that defendants did not abide by its terms.  Defendants commingled their money, maintained

10   joint bank accounts, and made no effort to keep account of their separate property.  Although

11   Ms. Nodus contends she engaged in "prudent financial and legal planning," Dkt. #12 at 7, her

12   testimony indicates otherwise.  By her own account, she "didn't keep track" of Mr. Ingram's

13   rent payments, Nodus Dep. at 23, and she is not sure whether he has paid her too much or too

14   little, id. at 27-28.  Indeed, Ms. Nodus agreed that determinations regarding paying of living

15   expenses, reimbursements and property investments were made on a "random" basis.  Id. at 92;

16   see also id. at 45 ("Money comes, money goes.").  Cf. DewBerry v. George, 115 Wn.App. 351,

17   356 (2003) (enforcing prenuptial agreement after finding that "[t]he record reflects painstaking

18   and meticulous effort to maintain separate finances and property.").  Although the prenuptial

19   agreement declares a separation of assets, plaintiff has demonstrated that the parties to the

20   agreement have not acted in accordance with the contract.  Ms. Nodus has not contested the

21   evidence that theirs was an agreement in name but not in fact.

22        The Court accordingly finds that plaintiff has demonstrated a likelihood of success on the

23   merits of her UFTA claim against defendants.

24   **3.  Likelihood of Irreparable Harm**

25        Plaintiff argues that defendants "have demonstrated the ability and willingness to hide

26

27   ORDER GRANTING IN PART
     PLAINTIFF'S MOTION FOR
28   PRELIMINARY INJUNCTION - 11

1    assets, frustrating [plaintiff's] efforts at restitution." Dkt. #13 at 22.  Defendants offer little by

2    way of response.  Mr. Ingram suggests that because plaintiff's attempts to obtain money from

3    him are futile given his minimal income, plaintiff will not suffer harm if the financial restraints

4    she seeks are not imposed. Dkt. #18 at 7.  Ms. Nodus's brief reiterates her belief that economic

5    harm does not warrant preliminary relief. Dkt. #21 at 8-9.[6]

6            The Court finds that plaintiff has demonstrated that she is likely to suffer irreparable

7    harm without a preliminary injunction freezing Mr. Ingram's assets.  Mr. Ingram has deposited

8    $20,000 in his 401(k) without notifying plaintiff, suggesting an attempt to protect that money

9    from a judgment in her favor.  See 29 U.S.C. § 1056(d); RCW § 6.15.020(3).  When he had

10   assets greater than $10,000 from his real estate sales business, he failed to disclose the existence

11   of those funds to plaintiff and spent the money instead.  Ingram Dep. at 241-42.  Plaintiff has

12   also submitted evidence that, within days of receiving a letter from plaintiff's counsel requesting

13   information about his financial status, Mr. Ingram cashed out his Whidbey Island Bank account,

14   _____

15          [6]  Both defendants question plaintiff's motives for bringing the present action.  See, e.g., Dkt. #18
     at 6 ("It is apparent plaintiff is pursuing this action for reasons other than any realistic expectation of
16   recovering from Gary even a small portion of the costs being incurred in pursuing her claims."); Dkt. #21
     at 9 ("[T]hese are the schemes and dreams of a plaintiff who is far more interested in hurting Mr. Ingram
17   by hurting Ms. Nodus than they are the work of a creditor legitimately trying to collect a debt.").
     Defendants further suggest that plaintiff's action "simply def[ies] logic and reason" because she is paying
18   more in attorney's fees than she will extract from defendants.  Dkt. #18 at 6; Dkt. #21 at 3, 9.
     Defendants' unsupported assumptions and personal attacks against plaintiff are irrelevant and
19   unpersuasive.  Defendants seem to forget that plaintiff is the victim of Mr. Ingram's criminal scheme; he
     stole over $1,000,000 from her, and his pleadings before the Court concede that Mr. Ingram will never
20   satisfy his debt to plaintiff.  If plaintiff is in fact "embittered" by the slow pace of repayment, see Dkt. #21
     at 9, 5, her resentment is justified.  Plaintiff has produced considerable evidence that Mr. Ingram has
21   hidden assets to which she has a legal claim and that Ms. Nodus has been more than complicit in the ruse.
     Unfortunately for plaintiff, the only way to secure her legal rights is through hiring legal counsel, for, as
22   noted by the Court at oral argument, Mr. Ingram proved unwilling to voluntarily comply with his legal
     obligation before plaintiff filed a lawsuit.  While defendants would doubtless be happier if plaintiff would
23   save herself the cost of attorney's fees (and save them the trouble of having to defend their case), and
     while the Court agrees that it is in all parties' best interest to come to speedy resolution of the matter, the
24   Court can hardly fault plaintiff for pursuing a remedy for a valid legal claim.

25

26

27   ORDER GRANTING IN PART
     PLAINTIFF'S MOTION FOR
28   PRELIMINARY INJUNCTION - 12

withdrawing over $19,000, Pflugrath Decl., Dkt. #29 ¶ 12, Ex. L, yet Mr. Ingram made no

mention of this money during his deposition.[7]   Mr. Ingram's admitted violations of the terms of

the Restitution Order indicate that a preliminary injunction is necessary to prevent the

consumption, dissipation, or fraudulent conveyance of Mr. Ingram's assets.

The harm posed by Ms. Nodus, however, presents a closer question.  The only evidence

plaintiff cites to establish that Ms. Nodus is likely to dissipate the value of her assets is the

$100,000 home equity line of credit Ms. Nodus secured using the Whidbey Island home as

collateral.  Ms. Nodus contends that the only reason she borrowed against her house was to pay

for her legal defense in this action.  Nodus Decl., Dkt. #22 ¶ 20.  Although there is no evidence

that Ms. Nodus is culpable in dissipating the value of her individual assets, the Court's

determination on the merits of plaintiff's UFTA claim indicates that the Whidbey Island home is

likely to be deemed the joint property of both Ms. Nodus and Mr. Ingram.  Because of the

likelihood that the home is an asset of Mr. Ingram that is encumbered by the Restitution Order,

the Court's injunction freezing Mr. Ingram's assets necessarily applies to half of that property.

Similarly, the injunction will apply to half of any joint bank accounts held by Ms. Nodus and

Mr. Ingram.

### 4.  Balance of Equities

The balance of hardships also tips in plaintiff's favor.  Mr. Ingram does not argue that he

will suffer harm if he is subject to financial restraints.  In fact, if Mr. Ingram indeed has just

enough funds to pay for his basic living expenses, see Dkt. #18 at 7, then an order preventing

him from gifting or transferring his assets will not impose an undue hardship.

Nor will Ms. Nodus suffer any undue hardship, as she remains free to utilize her

individual bank accounts as she sees fit.  There is no indication that an order freezing the value

---

[7]  Indeed, in his second declaration submitted to the Court the day before oral argument, Mr. Ingram stated that he "was concerned that [plaintiff] would garnish [his] bank account," Dkt. #46 ¶ 15, and explained that he contributed another $5,000 to his 401(k), id.

of half of her home and half of her joint bank accounts in this case  will affect Ms. Nodus's ability to conduct her financial affairs until an agreement is reached between the parties or a final decision is rendered by the Court.

### 5.  Public Interest

The Court finds that issuance of the preliminary injunction will have no harmful effect on the public interest.

### 6.  Preliminary Injunction and Freeze Asset Order

Based on the foregoing, defendants Gary V. Ingram and Pamela M. Nodus are ordered as follows:

(1) Within 30 days of this Order, each defendant shall file a sworn statement with this Court identifying all of their separate and/or joint assets, including but not limited to any bank accounts (with balances), brokerage accounts (identifying fair market value of any holdings), real estate, personal property over $2,000 in value, life insurance policies, and retirement accounts.

(2) Within 60 days of this Order, both defendants shall file a sworn statement with this Court identifying all transfers of cash or assets from Gary V. Ingram to Pamela M. Nodus from November 1998 to the present.

(3) Defendant Gary V. Ingram is prohibited from opening any new bank or brokerage accounts and from transferring assets or funds out of any existing bank or brokerage account. This provision extends to half of any joint bank accounts defendant Gary V. Ingram shares with defendant Pamela M. Nodus.  The Court imposes no restrictions on defendant Pamela M. Nodus's use of her half of any joint bank accounts.

(4) Defendant Gary V. Ingram is prohibited from withdrawing any money from his retirement accounts pending trial in this case.

(5) Defendant Gary V. Ingram is prohibited from conveying any cash or assets to any

ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 14

third party or to defendant Pamela M. Nodus pending trial in this case.  He may, however, pay ordinary living expenses such as the purchase of food, insurance and utilities, provided those payments do not exceed $2,000 a month.

(6) Defendant Gary V. Ingram is prohibited from dissipating any of his assets pending trial in this case, either through gifts, loans or other transactions.

(7) Defendants Gary V. Ingram and Pamela M. Nodus are prohibited from encumbering any more than half of the Whidbey Island Home through draws on a home equity line of credit recently obtained from the School Employees Credit Union ("SECU") or loans from any other lender.

(8) The Court has determined that there is no need for Mrs. Dargan to post a bond as security in this case given that Mrs. Dargan is already a judgment creditor of Gary V. Ingram and the likelihood of the injunction or freeze asset order causing any harm to the defendants.

### III.  CONCLUSION

For all of the foregoing reasons, the Court GRANTS in part plaintiff's motion for a preliminary injunction (Dkt. #13).

DATED this 22nd day of May, 2009.

MM S Lasnik

Robert S. Lasnik
United States District Judge

ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 15